**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**CHARLES TATAR and JENNIFER TATER,**

                                **Plaintiffs,**

         v.                                                          **1:10-CV-92**
                                                                     **(FJS/RFT)**
**GRAY MEADOWS TRUCKING, INC. and**
**HENRY L. BACHELDER,**

                                **Defendants.**
_____

**APPEARANCES**                          **OF COUNSEL**

**HACKER MURPHY, LLP**                   **JOHN F. HARWICK, ESQ.**
7 Airport Park Boulevard                 **JAMES E. HACKER, ESQ.**
Latham, New York 12110
Attorneys for Plaintiffs

**BURKE, SCOLAMIERO,**                   **THOMAS J. REILLY, ESQ.**
**MORTATI & HURD, LLP**                  **JEFFREY E. HURD, ESQ.**
9 Washington Square – Suite 201
P.O. Box 15085
Albany, New York 12212-5085
Attorneys for Defendants

**SCULLIN, Senior Judge**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

Plaintiffs commenced this action pursuant to 28 U.S.C. § 1332(a) to recover for damages

Plaintiff Charles Tatar ("Plaintiff") allegedly suffered in a vehicular accident that occurred on

January 28, 2008.  At that time, Plaintiff was the operator of a 1984 Ford Truck that his

employer, Mountain Fuels, Inc., owned.  Defendant Bachelder was operating a 2000 Tractor

Trailer, which his employer, Defendant Gray Meadows Trucking, owned.  The two vehicles

collided when the truck that Defendant Bachelder was operating crossed the center line.

Plaintiffs allege that Defendant Bachelder was negligent in that he was (1) operating the tractor trailer in a careless and negligent manner, (2) operating the tractor trailer at an unsafe rate of speed for the existing conditions, (3) following too closely to the vehicle ahead of him, (4) failing to maintain control of the tractor trailer, (5) failing to stop the tractor trailer and avoid the accident, (6) failing to stay in his designated lane of travel, and (7) failing to negotiate a turn.  In addition, Plaintiffs assert that Defendant Gray Meadows Trucking was negligent in that it (1) failed to keep the tractor trailer in a proper state of maintenance and repair, (2) violated applicable regulations and laws regarding the operation and maintenance of the tractor trailer, (3) failed to maintain, equip, inspect, and repair the tractor trailer adequately, (4) failed to train and supervise Defendant Bachelder adequately, and (5) negligently hired and selected Defendant Bachelder as an employee.

In their complaint, Plaintiffs contend that, as a result of the accident, Plaintiff sustained a serious injury as defined in Section 5102(d) of New York Insurance Law and/or economic loss greater than basic economic loss within the meaning of Section 5102(a).[1]  Plaintiffs assert three causes of action arising from the accident: (1) for serious injuries to Plaintiff due to the accident, (2) against Defendant Gray Meadows Trucking for vicarious liability under New York Insurance Law § 388 and as the employer of Defendant Bachelder pursuant to the doctrine of *respondeat superior*, and (3) on behalf of Plaintiff Jennifer Tatar for loss of services, society, companionship

---

[1] Section 5102(a) defines "basic economic loss" as "up to fifty thousand dollars per person of the following combined items, subject to the limitations of section five thousand one hundred eight of this article . . . ."  N.Y. Ins. Law § 5102(a).  The items listed in § 5102(a) include, among other things, medical expenses and loss of earnings.  *See id.*

and consortium of Plaintiff.

Currently before the Court are the parties' cross-motions for summary judgment. *See* Dkt. Nos. 17, 20.

## II. DISCUSSION

### A.    "Serious injury" under New York Insurance Law § 5102(d)

Jurisdiction in this case is based on diversity of citizenship; therefore, New York substantive law governs. *See Tsveitel v. Geoghegan*, No. 05-CV-5721, 2009 WL 2182379, *3 (E.D.N.Y. July 21, 2009) (citation omitted).  Under New York law, "'[w]hether a claimed injury meets the statutory definition of a "serious injury" is a question of law which may properly be decided by the court on a motion for summary judgment.'"  *Id.* (quoting *Martin v. Schwartz*, 308 A.D.2d 318, 319, 766 N.Y.S.2d 13, 15 (1st Dep't 2003) (citing *Licari v. Elliott*, 57 N.Y.2d 230, 237, 441 N.E.2d 1088, 1091, 455 N.Y.S.2d 570, 573 (1982))).  To maintain a claim for personal injuries arising from a motor vehicle accident, the plaintiff must prove that he sustained either basic economic loss or serious injury and that his injuries were causally related to the accident at issue.  *See id.* (citing N.Y. Insurance Law § 5104(a);[2] *Pommells v. Perez*, 4 N.Y.3d 566, 572, 830 N.E.2d 278, 281, 797 N.Y.S.2d 380, 383 (2005)).

Under New York Insurance Law § 5102(d), a serious injury is a personal injury that results in any of the following:

---

[2] Section 5104(a) provides, in pertinent part, that, "[n]otwithstanding any other law, in any action by or on behalf of a covered person against another covered person for personal injuries arising out of negligence in the use or operation of a motor vehicle in this state, there shall be no right of recovery for non-economic loss, except in the case of a serious injury, or for basic economic loss . . . ."  N.Y. Ins. Law § 5104(a).

> [1] death; [2] dismemberment; [3] significant disfigurement; [4] a
> fracture; [5] loss of a fetus; [6] permanent loss of use of a body
> organ, member, function or system; [7] permanent consequential
> limitation of use of a body organ or member; [8] significant
> limitation of use of a body function or system; or [9] a medically
> determined injury or impairment of a non-permanent nature which
> prevents the injured person from performing substantially all of the
> material acts which constitute such person's usual and customary
> daily activities for not less than ninety days during the one hundred
> eighty days immediately following the occurrence of the injury or
> impairment.

N.Y. Ins. Law § 5102(d).

"New York courts require objective proof of a plaintiff's injury in order to 'satisfy the statutory serious injury threshold [as] subjective complaints alone are not sufficient.'" *Tsveitel*, 2009 WL 2182379, at *4 (quoting *Toure v. Avis Rent A Car Sys., Inc.*, 98 N.Y.2d 345, 350, 774 N.E.2d 1197, 1199-1200, 746 N.Y.S.2d 865, 868 (2002)).

According to his answers to Defendants' interrogatories, Plaintiff claims that he has sustained (1) "a permanent and consequential limitation of use of his neck, cervical spine, cervical disc and associated nervous system," (2) "a significant limitation of use of his neck, cervical spine, cervical discs and associated nervous system," (3) "disfiguring scarring," and (4) "permanent loss of use of the cervical disc that was operated upon by Dr. Lawrence." *See* Plaintiffs' Verified Answers to Interrogatories of Defendants at ¶ 12.  Plaintiff further states that he "has sustained economic loss in excess of 'basic economic loss' due to his accident related injuries due to his past and future lost wages and medical expenses." *See id.* at ¶ 13.

As a preliminary matter, the Court notes that the only evidence in the record of any scarring is a letter in which Dr. Bilfield indicates that Plaintiff has a 4cm, i.e., 1.57480 inch, anterior cervical scar on his neck.  *See* Dr. Bilfield's Letter to Defendants' Counsel dated March

3, 2011, at 3.  Although Plaintiffs note that Defendants did not move for summary judgment on the issue of whether Plaintiff's scar would constitute a basis for finding that he suffered a serious injury, the Court finds that, as a matter of law, a reasonable person could not conclude that such a scar was unattractive, objectionable or an object of pity or scorn – the measure of whether a scar would be a significant disfigurement and, thus, constitute a serious injury within the meaning of § 5102(d).  *See Waldron v. Wild*, 96 A.D.2d 190 (4th Dep't 1983).  Furthermore, as Defendants correctly point out, removal of a disc does not constitute a serious injury.  *See Schou v. Whiteley*, 9 A.D.3d 706, 709 (3d Dep't 2004) (finding that the court "properly dismissed plaintiffs' claim, under Insurance Law § 5102(d), for a permanent loss of use of a body organ, member, function or system by finding that neither the removal of plaintiff's discs nor the loss of use of certain cervical and lumbar vertebrae constitutes a total loss of use" (citations omitted)).

Therefore, the Court finds that Plaintiffs may only rely on the following definitions of serious injury in this case: "permanent consequential limitation of use of" Plaintiff's neck, cervical spine, cervical discs and associated nervous system or a "significant limitation of use of" Plaintiff's neck, cervical spine, cervical discs and associated nervous system as a basis for their claim that Plaintiff suffered a serious injury as a result of the accident.

**B.    Causal relationship between injuries and accident**

Before the Court determines whether Plaintiff has demonstrated that he suffered a serious injury as the result of the accident, the Court must decide whether there is a causal connection between Plaintiff's injuries, serious or not, and the accident.

Defendants assert that, given the gap in time between the accident and Plaintiff's

treatment with his orthopedist, as well as his work history and Dr. Schneider's notes that Plaintiff

complained that he had started getting numbness in his hand that spread to both hands with some

pain about 2 ½ weeks before his first appointment with Dr. Schneider in October 2008, Plaintiffs

cannot establish that Plaintiff's injuries, even if serious, were causally related to the accident.

Specifically, Defendants assert that Plaintiff did not begin treating with Dr. Lawrence, his

orthopedist, until August 11, 2009, more than one and one-half years after the accident.

Furthermore, at Plaintiff's first visit to Dr. Lawrence, Dr. Lawrence's records indicate that

Plaintiff complained that, on or about October 2008, he began having constant pain in his

shoulders, upper arms and the dorsal aspect of his forearms going into the hands.  Plaintiff also

stated that the only thing he could recall was a head-on collision in January 2008, after which he

did not have substantial problems with his neck range of motion, stiffness or any problems in his

hands.  Moreover, Defendants note that Plaintiff never filed a Workers Compensation claim in

connection with the accident.

Finally, Defendants submitted the supplemental affidavit of Dr. Bryan Bilfield in which

he stated that, "within a reasonable degree of medical certainty[,] . . . traumatic herniations of C4-

5, C5-6 and C6-7 [would] result in immediate severe symptoms that would require immediate

medical attention."  *See* Bilfield Supplemental Affidavit sworn to September 23, 2011, at ¶ 3.

He further stated that "[s]omeone who suffer[ed] from such traumatic herniations and nerve

compressions would not typically be able to forego medical attention for a period of six months

or more."  *See id.*

In response, Plaintiffs note that, one week after the accident, Plaintiff sought treatment

with Dr. Lee McGunnigle, a chiropractor, complaining about neck and back pain as well as

numbness in his hands and fingers.  In his affidavit, Dr. McGunnigle noted that Plaintiff

"reported no prior history of neck or back pain prior to the accident" and that he performed

several objective tests that indicated that Plaintiff had suffered an injury to his spine, specifically

a disc herniation in his spine.  *See* Affidavit of Lee McGunnigle, D.C., sworn to August 9, 2011

("McGunnigle Aff."), at ¶¶ 6-7.  After examining Plaintiff, Dr. McGunnigle diagnosed him as

suffering from "Nerve Root compression, Brachial Radiculitis/Neuritis, Displacement of

Cervical Intervetebral [sic] Disc, [and] Hyperflex/Hypertext Injury."  *See id.* at Exhibit "A."  Dr.

McGunnigle opined that Plaintiff's complaints and symptoms were causally related to the January

2008 accident.  *See id.* at ¶ 5.

Plaintiff also submitted the affidavit of Dr. Robert Schneider, his family physician, from

whom he sought treatment in October 2008.  Dr. Schneider noted that, prior to the January 2008

accident, Plaintiff had never complained to him about neck or back pain; and he was not taking

any narcotic pain medication.  *See* Affidavit of Robert Schneider, M.D., sworn to August 23,

2011 ("Schneider Aff."), at ¶ 5.  When Plaintiff sought treatment in October 2008, he complained

about "back pain, significant numbness of the spine through the neck and down the arms and

hands and reported that the severe symptoms had been consistent for 2 to 2 ½ weeks" prior to

that visit.  *See id.* at ¶ 8.  Dr. Schneider obtained x-rays of Plaintiff's cervical spine, which

"showed a reversal of normal curvature (lordosis) which [was] consistent with a traumatic injury

to the spine such as whiplash from the truck accident."  *See id.* at ¶ 9.  Dr. Schneider urged

Plaintiff to obtain an MRI due to his complaints of numbness, but Plaintiff resisted because of his

claustrophobia.  *See id.*  "It was not until May of 2009 that [Plaintiff] finally agreed to undergo an

MRI of his cervical spine due to his continued severe pain and numbness in both hands[;] . . .

[p]rior to the [MRI], [Plaintiff] was sedated by Valium to address his claustrophobia." *See id.* at ¶ 11.

Dr. Schneider noted in his affidavit that the "MRI showed . . . significant disc herniations and cord damage" and that "[t]hese herniations were causing [Plaintiff's] severe symptoms[.]" *See id.* at ¶ 12. Dr. Schneider also opined that, "to a reasonable degree of medical certainty[,] [Plaintiff] sustained permanent and consequential limitation of use of his cervical and lumbar spine and a significant limitation of use of his cervical and lumbar spine which [were] causally related to the truck accident of January 28, 2008." *See id.* at ¶ 16.

Plaintiff also submitted the affidavit of Dr. James Lawrence, his orthopedist, who opined that, to a reasonable degree of medical certainty, Plaintiff's "cervical spine injury and herniations were directly and proximately caused by the truck accident of January 28, 2008." *See* Affidavit of James Lawrence, M.D., sworn to August 12, 2011 ("Lawrence Aff."), at ¶ 6. Dr. Lawrence also noted that it was his "understanding that there was approximately an eight (8) month period of time [in] which [Plaintiff] had relatively mild symptoms and sought no treatment for his cervical spine injury." *See id.* Dr. Lawrence stated that "[t]his [was] not unusual because cervical spine injuries and herniations such as [Plaintiff's] typically have a delayed onset of symptoms and become progressively worse over time." *See id.* He noted that, in his practice, he had "treated numerous patients who [had been] involved in car accidents causing disc herniations and associated damage where serious symptoms [had] not manifested themselves until 6 to 18 months later." *See id.*

Dr. Lawrence also noted that Dr. McGunnigle's records showed that Plaintiff "was complaining of pain in the neck, neck stiffness, numb hand and fingers, back pain and numbness

in feet and toes less than a week following the accident." *See id.* at ¶ 8. Dr. Lawrence believes that Plaintiff "herniated several discs [sic] his neck in this accident and that the symptoms gradually increased over a period of time until they became intolerable and he sought treatment with [Dr. Lawrence] at the direction of his primary care physician Dr. Robert Schneider." *See id.* at ¶ 9.

Finally, Plaintiff submitted the affidavit of Dr. James Cole who opined that, "to a reasonable degree of medical certainty, . . . [Plaintiff] suffered a significant limitation of use of his neck and back and a permanent consequential limitation of use of his neck and back as a direct and proximate result of the January 28, 2008 truck accident." *See* Affidavit of James Cole, M.D., sworn to August 30, 2011 ("Cole Aff."), at ¶ 5. Dr. Cole also stated that he disagreed with Defendants' contention that, because there was a gap in treatment, causation was speculative. Dr. Cole stated that he believed that Plaintiff "suffered herniated discs in his spine as a direct and proximate result of the January 28, 2008 accident and [that] his related [sic] became progressively worse." *See id.* at ¶ 10. Dr. Cole explained that "[t]he discs that were injured in the accident were weakened by the significant trauma from the accident and over time, became symptomatic, . . . [which] can happen over 6 to 18 months following the initial trauma." *See id.* at ¶ 11. Dr. Cole explained that, "[w]hen the extruded disc material presses on the adjacent spinal cord it causes loss of strength, limitation of motion and pain in the neck, arms, back, legs and hands [and that] this is what [he] believed happened in [Plaintiff's] case." *See id.* Finally, he stated that, "[o]ver time, the cervical herniations compressed [Plaintiff's] spinal cord which caused the pain, numbness and tingling in October 2008 and necessitated his fusion surgery." *See id.*

The parties' submissions make clear that there are issues of fact about whether Plaintiff's injuries are causally related to the January 28, 2008 accident.  Although Defendants state that Plaintiff did not seek treatment with an orthopedist until August 2009, almost eighteen months after the accident, this does not necessarily indicate that his injuries are not related to the accident.  Defendants ignore the significance of the fact that Plaintiff sought treatment from Dr. McGunnigle a week after the accident and that, at that time, he complained about "Dizziness, Neck pain, Neck stiffness, Numb hands and fingers, Shortness of breathe [sic], Back pain, [and] Numbness of feet and toes."  *See* McGunnigle Aff. at Exhibit "A."  Furthermore, in his affidavit, Dr. Schneider stated that Plaintiff complained about "back pain, significant numbness of the spine through the neck and down the arms and hands and reported that the severe symptoms had been consistent for 2 to 2 ½ weeks" prior to the appointment.  *See* Schneider's Aff. at ¶ 8.  This statement is not inconsistent with Dr. Schneider's notes in Plaintiff's medical records; he merely explains that Plaintiff stated that the pain was "consistent" in the past two weeks – not that it was the first time Plaintiff had experienced pain.

Finally, although Dr. Bilfield opined that injuries such as Plaintiff's would "result in immediate severe symptoms that would require immediate medical attention," he also stated that "[s]omeone who suffer[ed] such [injuries] . . . would not '**typically**' be able to forego medical attention for a period of six months or more."  *See* Bilfield Supplemental Affidavit at ¶ 3 (emphasis added).  However, both Dr. Cole and Dr. Lawrence disagreed with this assessment.  In fact, Dr. Lawrence stated that he had treated numerous people involved in vehicular accidents who had suffered disc herniations and associated damage and whose serious symptoms did not manifest themselves until six to eighteen months later.  *See* Lawrence Aff. at ¶ 6.

-10-

Accordingly, for all these reasons, the Court finds that there are issues of fact about whether there is a causal relationship between Plaintiff's injuries and the January 28, 2008 accident.  Therefore, the Court denies Defendants' motion and Plaintiffs' cross-motion for summary judgment on this issue.[3]

## C.   **"Permanent Consequential Limitation" or "Significant Limitation"**

"'In order to establish a permanent consequential limitation of use of a body organ or member, it is incumbent upon plaintiff to present competent evidence raising triable issues as to whether [his] injury was both permanent and consequential.'" *Tsveitel*, 2009 WL 2182379, at *5 (quoting *Kordana v. Pomellito*, 121 A.D.2d 783, 784, 503 N.Y.S.2d 198, 200 (3rd Dep't 1986)).  For purposes of the New York Insurance Law, "the term 'consequential' means 'important' or 'significant.'"  *Id.* (quotation omitted).  "A plaintiff alleging serious injury under the category of 'significant limitation' at the summary judgment phase must raise an issue of material fact regarding whether [his] alleged limitation was 'significant.'"  *Id.*  "'In this context, the term "significant" envisions something more than a minor limitation of use.'"  *Id.* (quotation omitted).  "'For these two statutory categories, [NY courts] have held that "[w]hether a limitation of use or function is 'significant' or 'consequential' (i.e., important . . .) relates to medical significance and involves a comparative determination of the degree or qualitative nature of an injury based on the

---

[3] The parties briefly addressed the issue of economic loss.  The resolution of this issue must await trial since the Court has determined that issues of fact exist as to whether Plaintiff's injuries are causally related to the accident.  If the jury finds that Plaintiff's injuries are not causally related to the accident, it will not need to address the issue of economic loss.  If, however, the jury finds that Plaintiff's injuries are causally related to the accident, the jury will then have to decide whether Plaintiff has proven that he suffered economic loss in excess of basic economic loss.

normal function, purpose and use of the body part.'"" *Id.* (quoting *Toure*, 98 N.Y.2d at 353, 746 N.Y.S.2d 865, 774 N.E.2d 1197 (quoting *Dufel v. Green*, 84 N.Y.2d 795, 798, 647 N.E.2d 105, 107, 622 N.Y.S.2d 900, 902 (1995))).

> In general,
>
> > "[i]n order to prove the extent or degree of physical limitation, an expert's designation of a numeric percentage of a plaintiff's loss of range of motion can be used to substantiate a claim of serious injury. An expert's *qualitative* assessment of a plaintiff's condition also may suffice, provided that the evaluation has an objective basis and compares the plaintiff's limitations to the normal function, purpose and use of the affected body organ, member, function or system."

*Id.* (quotation omitted).

"Moreover, 'a plaintiff's subjective claim of pain and limitation of motion must be sustained by verified objective medical findings.'" *Id.* (quoting *Grossman v. Wright*, 268 A.D.2d 79, 84, 707 N.Y.S.2d 233, 237 (2nd Dep't 2000)).

As an example, "herniated discs or disc bulges do not constitute serious injury absent objective medical evidence demonstrating the extent or degree of the alleged physical limitations resulting from the injuries and their duration." *Id.* (citations omitted). "'[O]nce a herniated disc has been established by objective medical evidence, such as an MRI, CT scan or X ray, "an expert's designation of a numeric percentage of a plaintiff's loss of range of motion can be used to substantiate a claim of serious injury."'" *Id.* (quoting *Durham*, 2 A.D.3d at 1114, 769 N.Y.S.2d 324 (quoting *Toure*, 98 N.Y.2d at 350, 746 N.Y.S.2d 865, 774 N.E.2d 1197)). "New York case law 'has consistently treated straight-leg raising tests as objective evidence of serious injury.'" *Id.* (quoting *Kim v. Cohen*, 208 A.D.2d 807, 807, 618 N.Y.S.2d 386, 387 (2nd Dep't 1994)).

Finally, on a motion for summary judgment, to meet the "serious injury" threshold of

New York Insurance Law § 5102(d), the initial burden is on the defendant to establish a *prima*

*facie* case that the plaintiff's injuries are not "serious."  *See id.* at *6 (citing *Gaddy*, 79 N.Y.2d at

956-57, 582 N.Y.2d 990, 591 N.E.2d 1176).  If the defendant meets its burden, the plaintiff must

"come forward with sufficient evidence to establish that 'serious injury' was indeed sustained."

*Id.* (citation omitted).


### 1. Defendants' initial burden

Defendants submitted the affidavit of Dr. Bilfield to support their position that Plaintiff

did not suffer a serious injury.  On March 3, 2011, Dr. Bryan S. Bilfield, a board certified

orthopedic surgeon, examined Plaintiff.  *See* Defendants' Exhibit "7."  Dr. Bilfield stated that he

was of the opinion, "within a reasonable degree of medical certainty that [Plaintiff] made an

excellent recovery from his cervical surgery and had no objective indications upon . . .

examination of any limitation of the lumbar spine."  *See* Affidavit of Bryan Bilfield, M.D., dated

June 22, 2011, at ¶ 6.  Upon examination of Plaintiff's cervical spine, Dr. Bilfield found "no

atrophy in either upper extremity[,] . . . which mean[t] he was using his upper extremities

normally."  *See id.* at ¶ 7.  Dr. Bilfield also found that "[P]laintiff's range of motion of the

cervical spine by observation showed normal flexion . . . [and] extension . . . [and that] [h]is

rotation was full and normal on the left."  *See id.* at ¶ 8.  Dr. Bilfield found "no atrophy in either

of [Plaintiff's] upper extremity [sic] when measured by tape measure[;] . . .  his strength was

normal at 5/5 in both upper extremities [and] [t]here was no evidence of muscle spasms upon

examination of cervical spine."  *See id.* at ¶ 9.

With regard to the lumbar spine, Dr. Bilfield found "no atrophy in either lower extremity[,] . . . no evidence of spasm over the lumbar spine . . . [and] motor strength and reflexes were normal for both lower extremities." *See id.* at ¶ 10.  Dr. Bilfield found that "[P]laintiff's range of motion of lumbar spine was full and normal [although he noted that] Plaintiff did have subjective complaints of pain in the posterior bilateral thighs upon lumbar flexion." *See id.* at ¶ 11.  Finally, "[b]ased on [his] examination of [P]laintiff and [his] review of the medical records, [Dr. Bilfield concluded that] there [was] no objective evidence of a significant permanent disability or limitation to [P]laintiff's lumbar or cervical spine." *See id.* at ¶ 12.

The Court finds that, based on the information that Dr. Bilfield provided in his affidavit, Defendants have met their initial burden of establishing a *prima facie* case that Plaintiff did not suffer "serious injury."  The burden thus shifts to Plaintiffs to come forward with sufficient evidence to demonstrate that Plaintiff did, in fact, suffer a serious injury.

### 2. *Plaintiffs' burden*

To support their position that Plaintiff suffered a serious injury, Plaintiffs submitted his treatment records and the affidavits of Dr. Lee McGunnigle, Dr. James Cole, Dr. Robert Schneider, and Dr. James Lawrence.  The Court will address each of these submissions in turn.

Dr. Lee McGunnigle, a chiropractor, treated Plaintiff about one week after the accident. Dr. McGunnigle noted that Plaintiff "reported no prior history of neck or back pain prior to the accident." *See* McGunnigle Aff. at ¶ 6.  He also noted that he performed several objective tests that indicated that Plaintiff had suffered an injury to his spine.  Specifically, at the time of his

visit, Plaintiff "had a disc herniation in his spine."  *See id.* at ¶ 7.  Dr. McGunnigle referred

Plaintiff for an MRI of his cervical and lumbar spines, but Plaintiff indicated that he was

claustrophobic and wanted to wait to see if the symptoms would subside before he sought

additional treatment.  *See id.* at ¶ 7.  After examining Plaintiff, Dr. McGunnigle's diagnosis was

that Plaintiff suffered from "Nerve Root compression, Brachial Radiculitis/Neuritis,

Displacement of Cervical Intervertebral [sic] Disc, [and] Hyperflex/Hypertext Injury."  *See id.* at

Exhibit "A."

   In addition, Plaintiff submitted the affidavit of Dr. James Cole who noted that Plaintiff

had "numerous objective signs of a spine injury," including MRIs of [Plaintiff's] neck and back

taken after the accident [that] show[ed] herniated discs impinging on the spinal cord."  *See* Cole

Aff. at ¶ 6.  As of May 24, 2011, Plaintiff had "significantly reduced cervical ranges of motion":

25-33% reduction in extension, a 12% reduction in lateral bending, a 50% reduction in right

rotation and a 50% reduction in left rotation.  *See id.* at ¶ 7.  Dr. Cole noted that Plaintiff's

"significantly reduced cervical range of motion [was] causally related to his permanent spinal

cord damage caused by the truck accident at issue."  *See id.* at ¶ 8.  In addition, Dr. Cole opined

that Plaintiff's normal function of

> his cervical spine and lumbar spine ha[d] been impaired due to his
> accident related injuries[;] . . . [specifically, he was] now restricted
> from sitting for a period in excess of 45 minutes[;] . . . impaired in
> his ability to walk up stairs and up an incline[;] . . . restricted from
> lifting objects weighing more than 10 pounds[;] [h]is hands and
> arms have reduced sensation and strength, [which] causes him to
> drop thing[s; and] [h]e has difficulty walking more than 100 meters
> due to the stiffness and pain in his lower back.

*See id.* at ¶ 9.

Thus, Dr. Cole concluded that Plaintiff was "significantly limited in his activities of daily living." *See id.* Dr. Cole also noted that Plaintiff's "July 2009 MRI showed spinal cord compression down to 3mm when 13 to 14mm is normal." *See id.* at ¶ 11.

Dr. Cole noted that, initially, Plaintiff's cervical herniations caused more severe symptoms than his lumbar herniation and that his cervical herniations became so symptomatic that, in October 2008, he reported constant pain, burning and numbness to his family doctor, Dr. Schneider, who ordered an MRI and referred him to Dr. Lawrence. *See id.* at ¶ 12. Dr. Cole stated that there was "truly no 'gap' in treatment but rather a delayed onset of symptoms resulting from herniated discs that were in [his] opinion caused by the January 28, 2008 accident." *See id.* Dr. Cole stated that Plaintiff "reported no neck or back symptoms before the accident[;] . . . the MRI's [sic] did not reveal any significant degenerative conditions that could account for his symptoms and limitations [and] there [was] no other trauma that could account for [Plaintiff's] significant disc herniation that required removal of his C5 vertebrae and adjacent discs." *See id.* at ¶ 13.

In addition, Dr. Cole noted that Plaintiff had chronic pain related to his spinal injury for which Dr. Cole was actively treating him as of August 2011. *See id.* at ¶ 14. Dr. Cole opined that, to a reasonable degree of medical certainty, due to his accident-related injuries, Plaintiff was "permanently and totally disabled from performing his usual and customary occupation as a fuel oil delivery truck driver" and, "due to his limitations and chronic pain, . . . [Plaintiff was] disabled from performing any type of significant gainful employment." *See id.* at ¶ 18. Finally, Dr. Cole opined that, because it had been more than 3 ½ years since the accident and Plaintiff still had chronic pain, Plaintiff's disability, pain and limitations were permanent. *See id.* at ¶ 19.

Finally, according to Dr. Cole's notes of his examination of Plaintiff on May 24, 2011, Plaintiff lacked "approximately three fingerbreadths from full chin to chest flexion," his "[e]xtension [was] good to 40-45 degrees," his "left and right cervical rotation [were] limited to 40 degrees each way and the same [was] true of lateral bending of the neck in both directions," his "back [was] tender over the sacrum and low lumbar paraspinals bilaterally," and he reported that his "low back pain on palpation [was] greater than the pain in either extremity." *See* Cole Aff. at Exhibit "B."

Plaintiff also submitted the affidavit of Dr. Robert Schneider, his family physician. Dr. Schneider noted that, prior to the January 2008 accident, Plaintiff had never complained to him about neck or back pain, and he was not taking any narcotic pain medication. *See* Schneider Aff. at ¶ 5. Dr. Schneider stated that Plaintiff treated with him "in October 2008 for his accident related injuries" and complained about "back pain, significant numbness of the spine through the neck and down the arms and hands and reported that the severe symptoms had been consistent for 2 to 2 ½ weeks." *See id.* at ¶ 8. Dr. Schneider obtained x-rays on Plaintiff's cervical spine, which "showed a reversal of the normal curvature (lordosis) which [was] consistent with traumatic injury to the spine such as whiplash from the truck accident." *See id.* at ¶ 9. Although he urged Plaintiff to obtain an MRI due to his complaints of numbness, Plaintiff resisted this recommendation for some time because of his claustrophobia. *See id.* "Shortly after October 2008, [Plaintiff] began to show signs of heart disease." *See id.* at ¶ 10. "It was not until May of 2009 that [Plaintiff] finally agreed to undergo an MRI of his cervical spine due to his continued severe pain and numbness in both hands." *See id.* at ¶ 11. The MRI was performed in July 2009, prior to which Plaintiff was sedated with Valium. *See id.*

-17-

Dr. Schneider noted that the "MRI showed . . . significant disc herniations and cord damage." *See id.* at ¶ 12.  Dr. Schneider further stated that "[t]hese herniations were causing [Plaintiff's] severe symptoms and [were] causally related to the truck accident." *See id.*  He immediately referred Plaintiff to Capital Region Orthopedic Group for a surgical consultation, and Plaintiff "eventually underwent a C5 corpectomy which involved the removal of his C5 vertebrae and the surrounding discs." *See id.*  Dr. Schneider "believe[s] these injuries were caused by the January 28, 2008 accident." *See id.*

Dr. Schneider has been treating Plaintiff since his surgery, most recently on July 8, 2011. *See id.* at ¶ 13.  At that time, Plaintiff complained "of chronic pain, headaches, poor sleep and numbness in his extremities." *See id.*  Plaintiff also suffered from anxiety and depression because of these injuries. *See id.*  Dr. Schneider believes that these symptoms are related to the accident injuries, and he has referred Plaintiff to pain management with Dr. Cole. *See id.*

Finally, Dr. Schneider stated that Plaintiff's "accident related injuries significantly impair his ability to perform his activities of daily living [and that] [h]e is totally disabled from his accident related injuries." *See id.* at ¶ 15.  Dr. Schneider opined, "to a reasonable degree of medical certainty that [Plaintiff] sustained permanent and consequential limitation of use of his cervical and lumbar spine and a significant limitation of use of his cervical and lumbar spine which are causally related to the truck accident of January 28, 2008." *See id.* at ¶ 16.

Unfortunately, most of Dr. Schneider's examination notes are difficult to read.  However, his notes of October 22, 2008, state that Plaintiff has had numbness in his spine, through his neck and down his arms and hands for 2-2 ½ weeks and that 2 ½ weeks ago he had started to get numbness in his hands that had spread to both hands with some pain.  Two years later, on

October 22, 2010, Dr. Schneider noted that Plaintiff had pain in his lower back that radiated to his front, that coughing made it worse, and that the pain was constant.

Finally, Plaintiff submitted the affidavit and medical records of Dr. James Lawrence.  Dr. Lawrence noted that "Dr. McGunnigle's records show[ed] [that Plaintiff] was complaining of pain in the neck, neck stiffness, numb hand and fingers, back pain and numbness in feet and toes less than a week following the accident."  *See* Lawrence Aff. at ¶ 8.  Dr. Lawrence believed that Plaintiff "herniated several discs in his neck in this accident and that the symptoms gradually increased over a period of time until they became intolerable and he sought treatment with [Dr. Lawrence] at the direction of . . . Dr. Robert Schneider."  *See id.* at ¶ 9.

Dr. Lawrence also stated that the MRI of July 15, 2009, "showed significant herniations especially at the C5-6 level[, which] . . . caused severe central spinal stenosis (narrowing) with a reduction of the thecal sac diameter to 3mm."  *See id.* at ¶ 10.  "Typically, the diameter of the thecal sac in that area of the spine should be 13mm to 14mm[, . . . which meant Plaintiff had a] 75% reduction in diameter . . . [and that] [t]his cord compression caused [Plaintiff] limitations that were both significant and consequential."  *See id.*

In addition, the July 2009 MRI "showed herniations at the C4-5, C6-7, and C7-T1 levels."  *See id.* at ¶ 11.  The MRI also showed myelomalacia (scarring of the spinal cord, which can be caused by a herniated disc compressing on the cord), within spinal cord at C4-5 and C5-6.  *See id.*  Dr. Lawrence opined that these MRI findings were "causally related to the truck accident."  *See id.*  He also stated that the "MRI findings [were] objective evidence of [Plaintiff's injury] which was caused by the January 28, 2008 truck accident."  *See id.* at ¶ 12.

Dr. Lawrence noted that, on August 11, 2009, the first time he saw Plaintiff, Plaintiff

"exhibited [the] following cervical range of motions, which were significantly reduced from normal[:] "extension: 30-40 observed, 60 normal, a 33-50% reduction; lateral bending: 30 observed, 45 normal, a 33% reduction; and rotation: 40-50 observed, 80 normal, a 37.5-50% reduction.  *See id.* at ¶ 13.  Dr. Lawrence opined that the loss of range of motion was caused by the accident.  *See id.* at ¶ 14.  Dr. Lawrence also noted that Plaintiff "had significant weakness in his wrists and weakness in his biceps" and that "[h]is sensation to pin prick was impaired over his forearms going into both hands."  *See id.* at ¶ 15.  He also noted that Plaintiff "had a positive Hoffmann sign[4] which is an objective test orthopedic surgeons use to determine whether or not there is a spinal injury," [and] had hyperreflexia,[5] and abnormal reflex response which was consistent with spinal cord impairment," and which is "objective evidence of spinal cord damage."  *See id.*  Furthermore, during his first visit, Plaintiff "complained of hand [sic] and discomfort on the front of his thighs[, which] was most likely a result of his disc herniations."  *See id.* at ¶ 16.

Dr. Lawrence performed a corpectomy and discectomy[6] on Plaintiff on November 16, 2009.  *See id.* at ¶ 17.  This "surgery alleviated some of [Plaintiff's] severe symptoms [but] . . . did not cure him and certainly his neck [would] never be the same as it was prior to the accident[.]"  *See id.* at ¶ 18.  Dr. Lawrence opined that the "spinal cord damage [was] permanent

---

[4] "Hoffmann sign" refers to the "excessive irritability of the sensory nerves to electrical or mechanical stimuli in tetany."  *Stedman's Medical Dictionary* (27th ed. 2000).  "Tetany" refers to "intermittent cramping."  *Id.*

[5] "Hyperflexia" refers to "[a] condition in which the deep tendon reflexes are exaggerated."  *Stedman's Medical Dictionary* (27th ed. 2000).

[6] "Discectomy" refers to the "excision, in part or in whole, of a intervertebral disk."  *Stedman's Medical Dictionary* (27th ed. 2000).

and [would] result in numbness and weakness in both [Plaintiff's] hands on a permanent basis . . .

[and would] significantly reduc[e the] range of motion in [Plaintiff's] neck of greater than 20%."

*See id.*

Dr. Lawrence also noted that, once Plaintiff's "severe cervical spine symptoms began to

subside following the surgery, his back injury became a more prominent problem." *See id.* at

¶ 19.  Therefore, he "referred [Plaintiff] to Dr. Iqbal, pain management specialist, . . . who

administered a series of lumbar injections to treat his symptoms." *See id.*  Dr. Lawrence stated

that, because Plaintiff's "injuries are permanent in nature, he [would] require ongoing medical

care and treatment in the form of pain management for the remainder of his life." *See id.* at ¶ 20.

Finally, Dr. Lawrence stated that he believed that Plaintiff "sustained a significant limitation of

use and a permanent and consequential limitation of use of his cervical spine, cervical discs,

cervical vertebrae, nervous system, and musculoskeletal system as a direct and proximate result

of the January 28, 2008 truck accident." *See id.* at ¶ 21.

In a letter to Dr. Schneider about his consultation with Plaintiff on August 11, 2009, Dr.

Lawrence wrote that Plaintiff had been having severe problems with his neck and bilateral upper

and lower extremities and that Plaintiff had stated that, "on or about October 2008 he began

having constant pain in his shoulders, upper arms and dorsal aspect of his forearms going into the

hands." *See* Lawrence Aff. at Exhibit "B," Dr. Lawrence's Letter to Dr. Schneider dated August

11, 2009, at 1.  He also noted that Plaintiff had stated that "the only thing he [could] recall was a

head-on collision that he had in January of 2008" and that, after that accident, "he did not have

substantial problems with neck range of motion., stiffness or any problems in his hands." *See id.*

He noted that Plaintiff had stated that, "since October, he [had] been having worsening problems

with dropping objects with his hands, weakness and loss of dexterity, . . . particularly . . . at work." *See id.* He "had a lot of numbness and tingling in his hands and arms over the course of the day" and that "[p]revious treatments included chiropractic manipulation alone." *See id.*

In this letter, Dr. Lawrence noted that his physical examination of Plaintiff showed that Plaintiff could walk around the room without significant pain; he had no acute distress; and that Plaintiff stated that, when he coughed, he felt electrical sensation down his shoulders on a consistent basis. *See id.* at 2. He noted that Plaintiff's "range of motion [was] about 60 degrees of cervical flexion, 30-40 degrees of extension, 30 degrees of lateral bending and 40-50 degrees of rotation." *See id.* Dr. Lawrence also noted that Plaintiff had "full range of motion of his shoulders to internal and external rotation, flexion and extension, abduction and adduction," had "no signs of impingement," and "[h]is rotator cuff strength [was] normal." *See id.*

Dr. Lawrence also noted that his neurologic examination of Plaintiff demonstrated that Plaintiff had "significant weakness of his bilateral wrist extensors that [he] would grade as a 4/5"; slightly weak biceps "that he would grade as 4+/5"; and that "his wrist flexor, finger flexor, hand intrinsics and triceps strength [was] 5/5." *See id.* Plaintiff's sensation was also impaired "over the dorsum of his forearm going into both hands [which was] consistent with the C6-C7 dermatomes bilaterally." *See id.* Plaintiff also showed "significant hyperreflexia bilaterally in his upper extremities with bilateral biceps and brachioradialis reflexes that reproduce repetitive finger flexion and pinch." *See id.* Plaintiff "had an inverted radial reflex bilaterally," slightly blunted triceps reflexes, "significant Hoffmann's[,] . . . slightly more severe on the right versus the left," "palpable symmetric pulses," and "[h]is Babinski response [was] plantar." *See id.*

Dr. Lawrence's assessment after his examination of Plaintiff was that Plaintiff had

"[m]ultilevel cervical spinal stenosis C4-5 and C5-6" and "significant compression both behind

the C4-5 disk spaces as well as the C-5 vertebral body." *See id.* at 3.  He also stated that,

clinically, Plaintiff had "significant cervical myelopathy[7] with gait dysfunction, hyperreflexia and

asymmetric Hoffmann's and weakness of his C-6 innervations." *See id.*  He recommended that

Plaintiff undergo surgery involving a "C-5 corpectomy and C-4 to 6 anterior instrumented

arthrodesis." *See id.*

 At a September 8, 2009 follow-up visit, Dr. Lawrence examined Plaintiff and found that

"he continue[d] to have reduction in range of motion of his cervical spine, particularly with

lateral bending," had "weakness of his bilateral wrist extensors, biceps and some sensation

abnormality over his C6 dermatomes bilaterally," was "significantly hyperreflexic," and had

"blunting of his triceps reflex and a significant Hoffmann's bilaterally, more severe on the right."

*See* Lawrence Aff. at Exhibit "B," Notes of September 8, 2009, at 1.  He also noted that he had

reviewed the radiographic and MRI findings, which demonstrated that Plaintiff had "significant

cervical spondylosis at C4-5 and C5-6, and on the MRI significant central spinal stenosis at C4-5

and C5-6 with an AP diameter of 4 mm at C4-5 and 3 mm at C5-6." *See id.*  Dr. Lawrence noted

that "[t]he vast majority of compression [was] anterior," that there was "significant compression

posterior to the C5 vertebral body with significant signal change within the body of the spinal

cord at those . . . levels [and that there was] really minimal involvement above or below at the

C3-4 and C6-7 levels, respectively." *See id.*

 In his notes of an examination dated December 31, 2009, Dr. Lawrence stated that his

---

[7] "Cervical myelopathy" refers to a "[d]isorder of the spinal cord." *Stedman's Medical Dictionary* (27th ed. 2000).

examination showed that Plaintiff had "some sensory loss on his anterior thigh and the region of the L2 and L3 dermatomes[,][8] . . . a decrease in his left patellar reflex referring to the right, . . . weakness in his left iliopsoas when compared to the right . . . [and] some clearly demonstrable radiculopathy in his lower leg." *See* Notes of December 31, 2009.

In his June 2, 2010 notes, Dr. Lawrence noted that the MRI findings demonstrated "L4-L5 and L5-S1 degenerative disk changes with protrusion on the left L4-5, positive lateral recess and foraminal stenosis, . . . disk herniation, [and] L-5 radiculopathy with L5-S1 disc osteophytic complex[.]" *See* Notes of June 2, 2010.  Dr. Lawrence noted that he started Plaintiff on a series of epidurals for his back.

In his December 28, 2010 notes, Dr. Lawrence stated that Plaintiff still had "refractory numbness and tingling in his hands and some longstanding dexterity loss as a result of chronic cervical myelopathy and cord compression." *See* Notes of December 28, 2010.  He also noted that Plaintiff's back pain "ha[d] recurred, radiating into his legs, in particular on the left side." *See id.*  Upon examining Plaintiff, Dr. Lawrence noted that there was "some limitation of [Plaintiff's] lower extremity range of motion and limitation of strength in his lower extremities[.]" *See id.*

Finally, in his April 22, 2011 notes, Dr. Lawrence stated that the MRI report demonstrated that Plaintiff had a "4-5 disk protrusion with lateral recess stenosis." *See* Notes of April 22, 2011.

Plaintiffs clearly have met their burden to come forward with sufficient medical evidence

---

[8] "Dermatome" refers to an "area of the skin supplied by cutaneous branches from a single spinal nerve . . . ." *Stedman's Medical Dictionary* (27th ed. 2000).

to create issues of fact regarding whether Plaintiff suffered a serious injury as a result of the accident under both the "permanent consequential limitation of use of" his neck, cervical spine, cervical discs and associated nervous system and the "significant limitation of the use of" his neck, cervical spine, cervical discs and associated nervous system prongs of the "serious injury" test.  Accordingly, the Court denies Defendants' motion for summary judgment and Plaintiffs' cross-motion for summary judgment on this issue.


### III. CONCLUSION

After carefully reviewing the file in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion for summary judgment is **DENIED**; and the Court further

**ORDERS** that Plaintiffs' cross-motion for summary judgment is **DENIED**.


**IT IS SO ORDERED.**


Dated: December 12, 2011
        Syracuse, New York


_____
Frederick J. Scullin, Jr.
Senior United States District Court Judge